NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

23-407

STATE OF LOUISIANA

VERSUS

ROBERT ALLEN MCPHEARSON

**********

APPEAL FROM THE
TWENTY-SEVENTH JUDICIAL DISTRICT COURT
PARISH OF ST. LANDRY, NO. 19-K-2067-A
HONORABLE GREGORY JAMES DOUCET, DISTRICT JUDGE

**********

LEDRICKA J. THIERRY
JUDGE

**********

Court composed of D. Kent Savoie, Van H. Kyzar, and Ledricka J. Thierry, Judges.

AFFIRMED.

**Mary Constance Hanes**
**Louisiana Appellate Project**
**Post Office Box 4015**
**New Orleans, LA 70178**
**(504) 866-6652**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Robert Allen McPhearson**

**Robert Allen McPhearson**
**David Wade Correctional Center H-2-A**
**670 Bell Hill Road**
**Homer, LA 71040**
**(318) 927-0400**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Robert Allen McPhearson**

**Alisa Ardoin Gothreaux**
**Assistant District Attorney**
**Chad Pitre**
**District Attorney**
**Twenty-Seventh Judicial District**
**Post Office Drawer 1968**
**Opelousas, LA 70571**
**(337) 948-0551**
**COUNSEL FOR APPELLEE:**
    **State of Louisiana**

**THIERRY, Judge.**

Defendant, Robert Allen McPhearson, was convicted of second degree murder, a violation of La.R.S. 14:30.1. Defendant was sentenced to life imprisonment at hard labor without the benefit of parole, probation, or suspension of sentence. On appeal, he challenges sufficiency of the evidence to support his conviction and several actions by the trial court during trial. After review, we affirm.

**FACTS AND PROCEDURAL BACKGROUND:**

Shortly after midnight on March 20, 2019, Alana Michelle Vanmol-Zuccarro and her boyfriend, Defendant, went to the Evangeline Downs Casino in Opelousas, Louisiana. Ms. Zuccarro was reported missing by her daughter later that day. On March 27, 2019, Defendant was pulled over by officers with the West Baton Rouge Parish Sheriff's Office ("WBRPSO") for operating a non-road-worthy vehicle on Louisiana Highway 415. He refused to provide verifiable identification, and the officers determined that the four-wheeler Defendant was operating was stolen from a camp in Torbert, Louisiana. Defendant was escorted to the parish jail where he told officers that he had "information about a murder." Defendant identified Ms. Zuccarro as the decedent. He denied stabbing or shooting Ms. Zuccarro; rather, he told the officers there was a fight. Two weeks after Ms. Zuccarro was reported missing, on April 3, 2019, officers with the St. Landry Parish Sheriff's Office ("SLPSO") discovered Ms. Zuccarro's severely decomposed body near Bayou Wauska. Her body was facedown and covered with palmetto leaves, and her pants and underwear were pulled down her legs.

On July 18, 2019, Defendant, Robert Allen McPhearson, was charged by bill of indictment with second degree murder, in violation of La.R.S. 14:30.1. On October 19, 2022, a unanimous twelve-person jury in St. Landry Parish found Defendant guilty as charged. On November 2, 2022, Defendant was sentenced to the mandatory term of life imprisonment at hard labor without the benefit of parole,

probation, or suspension of sentence. The trial court granted Defendant's motion for appeal, and he is now before this court alleging several assignments of error. The first two assignments of error were set forth in Defendant's counsel brief, while the remaining ones were set forth in Defendant's pro se and supplemental pro se briefs.

**ASSIGNMENTS OF ERROR:**

1. There is insufficient evidence to support Robert Allen McPhearson's conviction for second degree murder; the State failed to prove that he had the specific intent to kill his girlfriend; and

2. The trial court abused its discretion in denying defense counsel's challenge for cause of a potential juror who stated during voir dire that he would require the defendant to "[p]rove that he didn't do it."

**PRO SE ASSIGNMENTS OF ERROR:**

1. Court failed to grant mistrial tainted juror.

2. Court failed to grant mistrial tainted jury.

**SUPPLEMENTAL PRO SE ASSIGNMENTS OF ERROR:**

1. Judge abused his discretion by denying motion for new trial.

2. Judge abused his discretion by allowing a deputy . . . to intervene in hearing without consent.

3. Judge abused his discretion by denying me [the] right to appear.

**ERRORS PATENT:**

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find no errors patent.

**ASSIGNMENT OF ERROR NO. 1:**

In his first assignment of error, Defendant argues that the evidence was insufficient to sustain his second degree murder conviction. Defendant does not contest that he killed Ms. Zuccarro. Rather, Defendant claims that the State failed to prove he had the requisite specific intent to kill Ms. Zuccarro. Alternatively,

2

Defendant argues a responsive verdict of manslaughter should be entered. Therefore, according to Defendant, his conviction for second degree murder should be reversed.

The applicable standard of review when sufficiency of the evidence is raised is as follows:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La. 1981). It is the role of the fact finder to weigh the respective credibilities of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the trier of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See Graffagnino*, 436 So.2d at 563, *citing State v. Richardson*, 425 So.2d 1228 (La.1983). To obtain a conviction, the elements of the crime must be proven beyond a reasonable doubt.

*State v. Freeman,* 01-997, pp. 2–3 (La.App. 3 Cir. 12/12/01), 801 So.2d 578, 580.

> Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04-1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

*State v. F.B.A.*, 07-1526, pp. 1–2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138.

As for appellate review in cases relying on circumstantial evidence, this court has stated the following:

> When the conviction is based upon circumstantial evidence, La.R.S. 15:438 provides that the state "must exclude every reasonable hypothesis of innocence" in order to convict. *State v. Camp*, 446 So.2d 1207, 1209 (La.1984). "Circumstantial evidence consists of proof of collateral facts and circumstances from which elemental factors may be

inferred according to reason, experience and common sense." *State v. Burns*, 441 So.2d 843, 845 (La.App. 3 Cir.1983). However, La.R.S. 15:438 does not establish a stricter standard of review on appeal than the rational juror's reasonable doubt standard. The statute serves as a guide for the jury when considering circumstantial evidence. On appeal, the issue is whether a rational trier of fact, when viewing the evidence in a light most favorable to the prosecution, could find that all reasonable hypotheses of innocence were excluded. *State v. Williams*, 13-497 (La.App. 3 Cir. 11/6/13), 124 So.3d 1236, *writ denied*, 13-2774 (La. 5/16/14), 139 So.3d 1024.

*State v. Baumberger*, 15-1056, pp. 10–11 (La.App. 3 Cir. 6/1/16), 200 So.3d 817, 826–27, *writ denied*, 16-1251 (La. 5/26/17), 221 So.3d 859, *cert. denied*, 583 U.S. 950, 138 S.Ct. 392 (2017).

Louisiana Revised Statutes 14:30.1(A)(1) defines second degree murder, in pertinent part, as "the killing of a human being . . . [w]hen the offender has a specific intent to kill or to inflict great bodily harm[.]" "Specific criminal intent is that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow his act or failure to act." La.R.S. 14:10(1). "Specific intent may be inferred from the circumstances surrounding the offense and the conduct of the defendant." *State v. Draughn*, 05-1825, pp. 7–8 (La. 1/17/07), 950 So.2d 583, 592–93 (citations omitted), *cert. denied*, 552 U.S. 1012, 128 S.Ct. 537 (2007). Specific intent may be formed in an instant. *State v. Cousan,* 94-2503 (La. 11/25/96), 684 So.2d 382.

<u>*Evidence Presented at Trial*</u>

The first witness to testify was Glenn Henagan, a detective sergeant in the narcotics division of the WBRPSO. On March 27, 2019, Detective Henagan and several other officers were conducting surveillance at the Minnows Truck Stop on an unrelated narcotics case. During their surveillance, Detective Henagan observed an unidentified male driving a four-wheeler with two flat tires through the parking lot headed towards the highway. Detective Henagan pulled the driver over because the four-wheeler was not road-worthy. Detective Henagan identified Defendant as

4

the driver of the four-wheeler during his trial testimony; however, at the time of the stop, Detective Henagan said Defendant provided a false name, birthdate, and social security number when asked for his identification. As a result, the officers could not identify him, and Defendant was transported to the parish jail for fingerprint identification.

Detective Henagan testified that once they arrived at the parish jail, Defendant looked at him and said he had "information about a murder." Defendant said there was a fight but that he denied shooting "her" or stabbing "her." Detective Henagan testified that the fight occurred somewhere outside of Evangeline Downs, according to Defendant. Defendant gave the officers his name and the victim's name as Alana Michelle Zuccarro. He did not give a precise location of her body, but he indicated that he covered her body up. It was later determined the four-wheeler was stolen from a camp in Torbert, Louisiana.

Detective Brett Cavaliere with the WBRPSO worked in the narcotics division at the time of the offense. Detective Cavaliere was a part of the narcotics surveillance operation on March 27, 2019. His testimony confirmed that Defendant had attempted to operate a four-wheeler on the highway, which resulted in him being pulled over. Additionally, Detective Cavaliere recalled Defendant's refusal to provide his name, and the fact that Defendant was transported to the parish jail.

Corporal William Allen Conley also worked in the narcotics division with the WBRPSO at the time of the offense. Corporal Conley testified that he heard Defendant tell Detective Henagan that he wanted to discuss a murder, and he heard Defendant say that he had not stabbed or shot the victim but had covered up the body. According to Corporal Conley, Defendant did not appear to be as nervous during his conversation with Detective Henagan at the parish jail as he was during the traffic stop.

5

Corporal Jeffrey Marcelo testified he was a uniform patrol corporal with the WBRPSO. On March 27, 2019, Corporal Marcelo was dispatched to the Minnows Truck Stop to transport Defendant to the parish jail, which he said was about three to four minutes from the truck stop. During their drive to the parish jail, Defendant asked Corporal Marcelo for "help," and Corporal Marcelo advised Defendant to talk to Detective Henagan once he got to the parish jail. Corporal Marcelo relinquished custody of Defendant to the detectives and had nothing more to do with the case.

Raven Hill was Ms. Zuccarro's daughter. Ms. Hill said her mother had been dating Defendant for about two months at the time of her death. According to Ms. Hill, her mother had always had drug problems and mainly used methamphetamines. Ms. Hill became concerned about her mother when she did not show up to watch Ms. Hill's child as planned on March 20, 2019. Later that day, Ms. Hill's sister, Laken Masters, filed a missing person's report with the Pineville Police Department. The sisters also called hospitals, jails, and casinos to look for their mother. Ms. Hill said one of Ms. Zuccarro's favorite casinos to frequent was Evangeline Downs in Opelousas. Thereafter, Ms. Hill learned that a tow company mailed a letter to Ms. Zuccarro's mother's house regarding the truck Ms. Zuccarro was last seen driving.[1] Ms. Zuccarro's tennis shoes, jacket, purse, and W-2 form were later located near the area where the truck was towed from.

Laken Masters, Ms. Zuccarro's daughter, described Ms. Zuccarro's tattoos, including a fleur de lis on her wrist, a sun and moon on her foot, and a butterfly on her lower back. That information was used to identify the decomposed body recovered from near the bayou as Ms. Zuccarro.

Steven Ledoux lived in a rural area between Washington and Port Barre. Mr. Ledoux testified that on March 20, 2019, around 2:40 a.m., he was watching

---

[1]The truck was registered to Ms. Zuccarro's mother, Gloria Stockdale.

television when he heard a vehicle pull into the driveway. When Mr. Ledoux went outside, he saw a flashlight by his neighbor's shop and hollered. According to Mr. Ledoux, the flashlight went to a nearby truck, and he heard the truck start and drive away. Mr. Ledoux and his neighbor, Mr. Plattsmier, surmised someone was trying to steal gasoline after they found abandoned gas cans. Later that morning, Mr. Ledoux saw the same truck in a nearby ditch with its front tire rod broken.

Winfrid Plattsmier was a retired farmer who lived next to Mr. Ledoux. Mr. Plattsmier said the truck that was found in the ditch was "a small grey pickup truck[,]" but he agreed that the truck could have been tan in color.

Timothy Barlow with the Louisiana State Police was assigned to the Evangeline Downs Casino at the time of the offense. Trooper Barlow was contacted by Ms. Zuccarro's family members regarding her disappearance. Trooper Barlow watched surveillance video and found footage of Ms. Zuccarro entering the casino with Defendant. Subsequent surveillance footage showed both Ms. Zuccarro and Defendant walking out of the casino, Defendant driving away in a truck while Ms. Zuccarro reentered the casino, Ms. Zuccarro later walking out of the casino, and then Ms. Zuccarro driving away in the truck with Defendant at approximately 1:38 a.m. on March 20, 2019.

Detective Adam Rivette worked in the criminal investigation division of the SLPSO and was tasked with investigating the disappearance and death of Ms. Zuccarro. Detective Rivette became involved in the case on March 22, 2019, when personal effects were found near Bayou Wauksha. A pair of tennis shoes, a jacket, and a purse containing papers were collected and identified as belonging to Ms. Zuccarro. An initial search of the nearby area revealed nothing. Officers later searched the surrounding area with a drone, four-wheeler, and helicopter but were

7

unsuccessful in locating Ms. Zuccarro. Detective Rivette learned the truck Ms. Zuccarro was last seen driving was towed by the Louisiana State Police.

On March 27, 2019, Detective Rivette said the SLPSO received a call from the WBRPSO about Defendant's involvement in the case. On April 3, 2019, Ms. Zuccarro's body and truck keys were located in an area which had previously been searched. At trial, the State introduced numerous photographs depicting the state of Ms. Zuccarro's body, which was covered by palmetto leaves and severely decomposed. Her pants and underwear were pulled down, and she was lying face-down. The cybercrimes division determined that Defendant's cell phone and Ms. Zuccarro's cell phone were in close proximity from the time the pair left the casino. Officers also placed Defendant's cell phone and Ms. Zuccarro's cell phone in the vicinity of where Ms. Zuccarro's body was later found. Detective Rivette testified that the recovered shoes and jacket were not DNA tested.

Dr. Christopher Tape was accepted as an expert in forensic pathology. Dr. Tape performed the autopsy and determined the cause of death was blunt force injuries to the body due to assault. He testified the body was severely decomposed and partially skeletonized.[2] After excluding other causes of death, Dr. Tape said the rib fractures and the circumstances of the body being discovered in the woods resulted in his conclusion that Ms. Zuccarro most likely died from injuries sustained during an assault. Dr. Tape said the rib fractures occurred antemortem, or before death, and could have damaged her lungs and/or caused significant blood loss. Any evidence of strangulation or sexual assault was destroyed by animals and insects, according to Dr. Tape. A toxicology analysis revealed Ms. Zuccarro had methamphetamine, amphetamine, and THC in her system. Due to the state of decomposition, however, Dr. Tape could not quantitate the levels of drugs and could

---

[2]Due to the body's severe decomposition, Ms. Zuccarro's weight at the time of the offense could not be determined.

only conclude that Ms. Zuccarro consumed the drugs prior to her death. On cross-examination, Dr. Tape agreed that methamphetamine could cause hallucinations, aggressive behavior, and irrational reactions. He indicated it was possible for ribs to fracture during CPR.

Anna Lavespere testified she was Ms. Zuccarro's friend but had never met Defendant. On March 20, 2019, right before 2:00 a.m., Ms. Lavespere received a phone call from Ms. Zuccarro. Ms. Zuccarro asked her to bring gas because she said she was nearly out of gas, and according to Ms. Lavespere, she seemed very upset.

Q. She did, okay, did you ask her what was wrong?

A. It kind of concerned me and I said what is going on and she says well, Robert is with me and I said oh my f—ing God, Michelle[.] I said, seriously and she said I know just come, she says you know what just forget about the gas can, just come get me and I said okay, I said look just stay calm, I'm coming and all you gotta [sic] do is just tell me where you're at, send me your location and --

Q. Did she?

A. No, ma'am.

Ms. Lavespere said Ms. Zuccarro was driving Ms. Zuccarro's truck. Ms. Zuccarro hung up the phone, and Ms. Lavespere tried calling her back numerous times to no avail. She was also unable to reach Defendant on the phone. Ms. Lavespere said she had seen Ms. Zuccarro the day before she went missing and testified Ms. Zuccarro had a busted mouth, a black eye, and scratches on her face. According to Ms. Lavespere, Ms. Zuccarro admitted that Defendant "put hands on" her.

After the State rested its case-in-chief, the defense called Defendant to the stand. Defendant testified about his criminal record and use of methamphetamines:

No, a lot of my convictions, like I said I had five of them. My first one was the um, the meth, the drug charge. I had a domestic back then, I had theft of a motor vehicle, a simple burglary and then an unauthorized use of a motor vehicle, that's my five and a lot of times when I -- when I went to court or on some charges, actually I had . . . a couple of charges

9

at one time and a lot of my charges -- actually all of them I pled out to under my lawyer about a better charge or easier sentence, whatever it might have been. I [have] never been through trial.

Defendant said he met Ms. Zuccarro at his boss's house when she went there to get drugs in November 2018, and they began a relationship thereafter. Defendant testified that on March 20, 2019, he and Ms. Zuccarro drove to Evangeline Downs in her tan Tacoma truck and arrived shortly after midnight. Defendant denied that he caused Ms. Zuccarro's black eye as Ms. Lavespere claimed. According to Defendant, their "relationship was kind of rocky," and they had been romantically separated the days prior to their trip to Evangline Downs.

Defendant testified that he and Ms. Zuccarro gambled at the casino until Defendant decided to leave to put gas in the truck. Ms. Zuccarro continued playing at the casino. Defendant claimed that he had wanted to go home, but Ms. Zuccarro did not want to.

> A. Actually, . . . I was sitting in the truck, I had a little bit of drugs left over, meth, I did a little bit of drugs trying to call her, trying to talk her into leaving [be]cause I had to work the next day.
>
> Q. Trying to talk to who?
>
> A. Uh, Ms. [Zuccarro]. I tried to call and call.
>
> . . . .
>
> A. Well, while I was at the gas station I called and uh numerous times and I finally got her to answer and we had a little conversation, she hung up and um, then I left from there headed towards the house, but I never stopped wanting to call her and I called numerous times.

According to Defendant, he drove towards his house, but after Ms. Zuccarro called to say she was ready to leave the casino, he drove back to Evangeline Downs to pick her up. As they were driving to Alexandria, the truck's gas light came on. Defendant confirmed they tried to steal gas because they did not have any money but were caught. Defendant and Ms. Zuccarro drove about half a mile before the truck broke down, causing them to swerve into the ditch. Fearing the property owner

10

was chasing them, Defendant and Ms. Zuccarro got out of the truck and ran into the

woods. Defendant said he and Ms. Zuccarro "took cover" for about twenty to thirty

minutes and then got into an argument:

A.  We got in an argument and it heated up from there I guess, maybe everything coming into play you know, it was already kind of heated element you know, --

Q.  What do you mean [about] everything coming into play?

A.  I guess the whole night of everything just going wrong, truck breaking down, broke, out of gas, . . . just all the circumstances together I guess.

Q.  Okay, so you said an argument started?

A.  Yes, sir.

Q.  And then what?

A.  And we got in an altercation.

Q.  What do you mean?

A.  Um, it was -- I was still laying down . . . and we started arguing and she -- and I can't really recall if it started out by a punch or a kick, but we got in a blissal(sic), a scrap I guess you could call it you know, a fight.

Q.  Okay, let me stop you there[;] you don't know if it started by a punch, or a kick? A punch or a kick by you?

A.  No, sir.

Q.  Okay, by Ms. Zuccarro?

A.  Yes, sir.

Q.  To you?

A.  Yes, sir.

Q.  Okay, and so then what happened?
A.  Um, we got into it you know, and she hit me a couple of times and I was still on the ground though and I hit her[.] I remember hitting her.

Q.  You hit her how, with a closed fist?

A.  Yes, it was a closed fist yes, sir.

11

Q. Where?

A. In the belly[.] I was still down so in the middle section.

Q. And was she standing up at the time?

A. Yes, sir.

Q. Okay, all right, so you hit Ms. Zuccarro with a closed fist[;] do you remember how many times you hit her?

A. . . . two or three times for sure maybe.

Q. So you hit her two or three times in the body area?

A. Yes, sir.

Q. Um, did you hit her anywhere else?

A. No, sir.

Q. Okay, when you hit Ms. Zuccarro two or three times as you say, what happened, what happened?

A. She fell, she actually fell over.

Q. She fell over, did she fall on her back, did she fall on her face, how did she fall?

A. Well, it was actually dark so she didn't really fall -- she kind of fell[.] I'm not sure if it was actually on her knees, it wasn't totally on her back, she just kind of fell and um, and at the time it was still dark down there[;] it was night time and so when she fell I rolled away from her and she stayed right there so maybe she -- she fell in the place -- she didn't fall like on her back, maybe kind of on her side or maybe just down a little bit. I don't recall, it was so dark so I couldn't really -- but I know she fell.

Q. Okay, and you said when Ms. Zuccarro fell you rolled away from her?

A. Yes, sir.

Q. Okay, so you were on the ground at this point still?

A. . . . I was yes, sir, I was still on the ground, I never got up during this.

Defendant testified that after Ms. Zuccarro fell, she was still breathing and "making some sounds." However, after five to ten minutes, Defendant could not

12

hear any sounds coming from Ms. Zuccarro. He walked towards her and noticed she was not moving or breathing. Defendant said he did not know what to do, so he performed CPR. Defendant testified that he was not trained in CPR and all he knew to do was "pump" her chest and blow in her mouth. According to Defendant, he heard gurgling sounds and tasted blood while he was performing CPR. Defendant said he performed CPR for about ten minutes and eventually determined she was dead. Thereafter, he decided to leave:

> A.    . . . I drug the body a little further in the woods and hid it and just took off.
>
> Q.    Wait I'm sorry, I'm sorry, I'm gonna [sic] give you a moment to get your composure because I didn't hear what you said.
>
> A.    I said once I -- once I couldn't figure nothing out man I -- I grabbed her and I drug her a little ways and covered her up and left.
>
>     . . . .
>
> Q.    You drug Ms. Zuccarro's body is what you're saying?
>
> A.    Yes.
>
> Q.    How did you do that[;] what did you do first?
>
> A.    I just -- we wasn't [sic] that far in the woods and I didn't know what to do and I just -- I didn't know where to go, where to turn, I didn't know how to even go about this and so I decided to drag her and cover her up with leaves. Where to go, I didn't know where to go[;] I just started walking.

Defendant said he did not pull her pants or underwear down and explained that happened when he was dragging her body. Defendant said he decided to "take off" walking through the woods. After walking for days, Defendant happened upon a hunting camp and stole a four-wheeler. Defendant testified he was driving to see his mother in Pensacola, Florida, when officers from the WBRPSO pulled him over. Regarding his statement to Detective Henagan, Defendant testified:

> Man I told them something had happened . . . and I said man, you know it's something about a murder, a crime and I'm trying to tell him I'm going through something right now, I don't know what to do and

13

he's all what do you mean? I said, ["M]an, I didn't stab her, I didn't shoot her, there's a fight, she died and I covered her up I don't know what to do[,"] and . . . from there I don't think he had any knowledge what I was talking about you know.

On cross-examination, Defendant said he was six feet tall and weighed 215 pounds at the time of trial. He testified that he weighed less in 2019 because he was on drugs. When asked, Defendant said he had pled guilty to felony domestic abuse strangulation in 2016. Following Defendant's testimony, the defense rested.

## Second Degree Murder

In his brief, Defendant argues that the State failed to prove he had the specific intent required for second degree murder. Similar to his trial testimony, Defendant asserts that he and Ms. Zuccarro got into an argument, which resulted in him hitting "her in the belly, but only after she struck him first." While he was forthcoming about other details regarding the incident, he always denied that he intended to kill Ms. Zuccarro. Defendant also alleges that his willingness to cooperate with the investigation and the corroboration of his statements provides credibility to his statement that he did not intend to kill her.

On the other hand, the State emphasizes that the standard of reviewing a claim of insufficient evidence on appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789 (1979). The State summarizes its argument as follows:

> The State submits that the physical evidence depicting the positioning of the body, the state of the [body's] undress, Defendant['s] attempt to evade detection by covering her up with brush, her neatly placed purse and neatly placed shoes found on the property and his flight, criminal background and implausible testimony all together created convincing circumstantial evidence that he violently killed Alana Zucca[r]ro in the early morning hours of March 20, 2019.

14

"Specific criminal intent need not be proven as a fact, but may be inferred from the circumstances of the transaction and the actions of the defendant." *State v. Maxie*, 93-2158, p. 11 (La. 4/10/95), 653 So.2d 526, 532 (citation omitted).

The evidence showed that Defendant and Ms. Zuccarro were together near Bayou Wauska after their attempt to steal gasoline from Mr. Plattsmier's farm. Defendant testified that they got into an argument which turned physical, and he admitted to punching Ms. Zuccarro in her stomach several times. Dr. Tape's autopsy confirmed Ms. Zuccarro suffered blunt force trauma as she had four broken ribs on each side of her body. Defendant testified that after unsuccessfully performing CPR, he dragged her body and covered it with palmetto leaves to avoid discovery. Defendant then fled the scene, leaving her body in the elements for two weeks. Based on these facts, we find that Defendant's specific intent to kill was established.

Further, courts have consistently held that flight is a circumstance from which guilt can be inferred:

> Evidence of flight, concealment, and attempt to avoid apprehension is relevant. It indicates consciousness of guilt and, therefore, is one of the circumstances from which the jury may infer guilt. This rule applies notwithstanding that the evidence may disclose another crime. *State v. Brown*, La., 322 So.2d 211 (1975); *State v. Graves*, La., 301 So.2d 864 (1974); *State v. Nelson*, 261 La. 153, 259 So.2d 46 (1972). See also *State v. Lane*, La., 292 So.2d 711 (1974); *State v. Johnson*, 249 La. 950, 192 So.2d 135 (1966)[, *cert. denied*, 388 U.S. 923, 87 S.Ct. 2144 (1967)]; *State v. Goins*, 232 La. 238, 94 So.2d 244 (1957)[, *cert. denied*, 355 U.S. 847, 78 S.Ct. 74 (1957)]; 29 Am.Jur.2d, Evidence, §§ 280 et seq., pp. 329 et seq. A court may admit a wide range of evidence to prove flight, concealment, and attempt to avoid apprehension. *State v. Nelson*, supra.

*State v. Davies*, 350 So.2d 586, 588 (La.1977). *See also State v. Rubens*, 10-1114 (La.App. 4 Cir. 11/30/11), 83 So.3d 30, *writ denied*, 12-374 (La. 5/25/12), 90 So.3d 410, *and writ denied*, 12-399 (La. 10/12/12), 99 So.3d 37, *cert. denied*, 568 U.S. 1236, 133 S.Ct. 1595 (2013).

The jury heard testimony from Defendant indicating that he was attempting to get to his mother's house in Florida when he stole a four-wheeler and was later pulled over by officers with the WBRPSO. Defendant did not attempt to seek assistance for Ms. Zuccarro.

At trial, Defendant admitted that he had several prior convictions, including a conviction for domestic abuse battery strangulation. Though Defendant implies in his brief that it was not clear whether his actions of hitting Ms. Zuccarro resulted in her death, Dr. Tape expressly testified that any evidence of strangulation was gone due to the body's decomposition. Dr. Tape did, however, have evidence that Ms. Zuccarro received blunt force trauma to her abdomen, as shown by the numerous broken ribs which could have damaged her lungs and/or caused significant blood loss. Defendant's hypothesis of innocence presented at trial—that the rib fractures were caused by him performing CPR—was obviously rejected by the jury as unreasonable. Considering *State v. Captville*, 448 So.2d 676 (1984), and Defendant's failure to raise any new hypotheses of innocence, Defendant's argument fails. The jury had the opportunity to weigh the evidence showing the circumstances of Ms. Zuccarro's death and Defendant's self-serving testimony, and therefore the jury's conclusion that Defendant killed Ms. Zuccarro with the specific intent to kill or to inflict great bodily harm was not unreasonable.

## *Responsive Verdict of Manslaughter*

Alternatively, Defendant argues the evidence presented at trial supports a guilty verdict of manslaughter, and he asks this court to modify his judgment of conviction in accordance with La.Code Crim.P. art. 821(E).[3] Manslaughter is defined, in pertinent part, as:

---

[3]That article provides: "If the appellate court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court,

16

A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed[.]

La.R.S. 14:31(A)(1). This court has discussed the responsive verdict of manslaughter as follows:

> When the fact finder, in this case, the judge, finds the elements of second degree murder, it then must be determined whether the circumstances indicate the crime was actually manslaughter. *State v. Jack*, 596 So.2d 323 (La.App. 3 Cir.), *writ denied*, 600 So.2d 611 (La.1992). To reduce second degree murder to manslaughter, a defendant must present evidence to show by a preponderance that the homicide was committed in "sudden passion" or "heat of blood" immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. *State v. Lee,* 498 So.2d 1177 (La.App. 3d Cir.1986), *writ denied*, 504 So.2d. 874 (La.1987). "Sudden passion" and "heat of blood" are not elements of the crime of manslaughter. They are factors which mitigate against finding a defendant as culpable as a person who commits a homicide without the occurrence of any extenuating event. *State v. Lombard*, 486 So.2d 106 (La.1986).

*State v. Stewart*, 00-143, pp. 3–4 (La.App. 3 Cir. 10/4/00), 771 So.2d 723, 726, *writ denied*, 00-3135 (La. 11/2/01), 800 So.2d 866. "On appeal, the question for the reviewing court is whether a rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the mitigating factors were not established by a preponderance of the evidence." *State v. Humphrey*, 22-724, p. 14 (La.App. 3 Cir. 3/29/23), 364 So.3d 437, 446.

In brief to this court, Defendant asserts that there was a preponderance of evidence establishing he hit Ms. Zuccaro after being provoked and that act occurred in sudden passion or heat of blood. However, the State argues that there was no

---

... may modify the verdict and render a judgment of conviction on the lesser included responsive offense." La.Code Crim.P. art. 821(E).

evidence presented to support a deprivation of reason or inflammatory circumstance to reduce the murder to manslaughter. Other than Defendant's self-serving testimony, there is nothing in the record that suggests Ms. Zuccarro initiated a confrontation, provoked Defendant, or engaged in aggressive behavior. Thus, the jury had to discern whether the homicide should be reduced from second degree murder to manslaughter committed in sudden passion or heat of blood. Viewing the evidence in a light most favorable to the prosecution, we find that a rational jury could have found that Defendant failed to show by a preponderance of the evidence that he acted in sudden passion or heat of blood to justify the lesser verdict of manslaughter.

Accordingly, this assignment of error is without merit.

## ASSIGNMENT OF ERROR NO. 2:

In his second assignment of error, Defendant argues that the trial court abused its discretion in denying his challenge for cause of prospective juror, Paul West. Defendant suggests that defense counsel exhausted all of his peremptory challenges; therefore, the failure to excuse the prospective juror constitutes reversible error. In contrast, the State argues Mr. West's responses, taken as a whole, do not reveal bias, prejudice, or an inability to follow the law.

Appellate review of a denial of a challenge for cause is not preserved unless a defendant lodged a contemporaneous objection to the trial court's ruling. Defendant failed to lodge an objection to the trial court's denial of the challenge for cause.

In *State v. Clark*, 12-508, p. 99 (La. 12/19/16), 220 So.3d 583, 663, *cert. granted, judgment vacated on other grounds*, ___ U.S. ___, 138 S.Ct. 2671 (2018), the supreme court stated:

> [Louisiana Code of Criminal Procedure Article] 800(A) requires an objection at the time of the ruling, which denies a challenge for cause, in order to preserve the claim for appellate review. Article 800(A) also mandates that the nature of the objection and the grounds therefor be

stated at the time of the objection. With respect to that provision, this court has made clear:

> Our law is also settled that an objection need not be raised by incantation. "It is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take, or of his objections to the action of the court, and the grounds therefor." C.Cr.P. 841; *State v. Boutte*, 384 So.2d 773 (La. 1980). The requirement that objection be raised contemporaneously is not meant to be inflexible, but is designed "to promote judicial efficiency and to insure fair play." *State v. Lee*, 346 So.2d 682, 684 (La. 1977). Article 800 should not be read to differ in this respect from Article 841.

*State v. Vanderpool*, 493 So.2d 574, 575 (La. 1986).

In *Clark*, the supreme court found the defendant could not assign error to the denial of a challenge for cause as he failed to lodge a contemporaneous objection to the trial court's ruling. Likewise, in *State v. Anderson*, 06-2987, p. 28 (La. 9/9/08), 996 So.2d 973, 996, *cert. denied*, 556 U.S. 1165, 129 S.Ct. 1906 (2009), the supreme court cited La.Code Crim.P. art. 800 and stated that "[a] defendant must object at the time of the ruling on the refusal to sustain a challenge for cause of a prospective juror." Most recently, in *State v. Sagastume*, 22-1824 (La. 12/8/23), ___ So.3d ___, the supreme court held: "After reviewing the jurisprudence pertaining to Code of Criminal Procedure art. 800(A), we find that the article requires a defendant to object contemporaneously in order to assign as error a ruling of a trial court refusing to sustain the challenge of a juror for cause."

Because Defendant failed to lodge an objection to the trial court's denial of his challenge for cause of Mr. West, this assignment of error is not preserved for review.

**PRO SE ASSIGNMENT OF ERROR NO. 1:**

In his first pro se assignment of error, Defendant argues the trial court erred in failing to grant his motion for mistrial after learning that a juror remained in the

19

courtroom while the defense team was discussing the case at the end of the first day of trial. On the second day of trial, the trial court held an in-chambers conference regarding the juror, Fredmonica Pickney. Defense counsel explained the situation as follows:

> **MR. BIROTTE**: Yes, sir, Your Honor, on yesterday at the close of the evidence, we turned our attention to watch what we thought were all of the jurors leaving the courtroom. At that point, I began speaking to my client, Mr. McPhearson, myself and my investigator, Mr. Michael Grimes, and we began discussing the case and what we thought the evidence was showing at that point . . . in the presentation and I was loud with my client, it was some profanity being used there as well, and we started talking about the evidence that was to come as well as commenting on we thought . . . that evidence would show, how the jury would take it, and as well as other defense strategies considerations and I'm sure it was within hearing of Ms. Pickney at that time. Um, it went on for about I'd say ten to fifteen minutes. When I happened to . . . turn around and glance back at the jury box, I noticed that Ms. Pickney was sitting there. At that point, discussions ended and I advised my client that I would speak to him, but I did advise him that I would be bringing this issue up to the Court this morning prior to going forward.

Thereafter, Ms. Pickney was brought into the chambers and put under oath. Defense counsel, the State, and the trial court asked her questions pertaining to counsel's conversation with Defendant. Ms. Pickney confirmed that she was present in the courtroom during the defense team's conversation, but she repeatedly denied hearing anything that was said. When asked, Ms. Pickney answered that she could still be a fair and impartial juror.

After the trial court reconvened in the courtroom, defense counsel moved for a mistrial:

> **MR. BIROTTE**: Pursuant to the previous discussion that we had in Chambers, Your Honor, regarding the presence of one of the jurors, Your Honor, we would move for a mistrial[.] Your Honor, we believe that the information that I was discussing with my client at the close of Court on yesterday, with that juror being present, possibly tainting her -- or having a great likelihood of tainting her opinion of this case and prejudicing my client, Your Honor, with the possibility that that information could have been communicated to the remaining jurors. Therefore, Your Honor, on those grounds we would request -- move for a Mistrial.

. . . .

> **THE COURT**: Okay, just for the record just to clarify matters at the close of the trial yesterday, all the jurors departed with the exception of one, Ms. Fredmonica Pickney, she remained in the jury box, she was waiting on a work release that was being prepared by my office staff, so she did remain in the jury box when they were having discussions with Mr. Birotte and his client. We had an in chambers conference and we ultimately interrogated Ms. Pickney. Ms. Pickney stated that she did not hear anything, she didn't focus her attention toward Mr. Birotte or his client, [and] she in fact stated . . . she was looking down when this was -- when she was in the jury box and she did confirm that she did not hear anything, did not eavesdrop. She got her paperwork and she left. So with that said, the Court is gonna [sic] deny the mistrial in this matter.

Appellate courts "review the denial of a motion for mistrial under the abuse of discretion standard of review." *State v. Hernandez*, 17-803, p. 5 (La.App. 3 Cir. 3/7/18), 241 So.3d 1053, 1057 (citing *State v. Hopkins*, 626 So.2d 820 (La.App. 2 Cir. 1993)). Louisiana Code of Criminal Procedure Article 771 provides:

> In the following cases, upon the request of the defendant or the state, the court shall promptly admonish the jury to disregard a remark or comment made during the trial, or in argument within the hearing of the jury, when the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury:

> (1) When the remark or comment is made by the judge, the district attorney, or a court official, and the remark is not within the scope of Article 770; or

> (2) When the remark or comment is made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770.

> In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial.

"Mistrial is a drastic remedy, which is warranted only if substantial prejudice resulted which would deprive defendant of a fair trial[.]" *State v. Clay*, 441 So.2d 1227, 1231 (La.App. 1 Cir. 1983), *writ denied*, 446 So.2d 1213 (La.1984) (citations omitted). A determination of whether a defendant suffered prejudice rests solely within the discretion of the trial court; thus, Defendant must show he suffered actual

prejudice for this court to reverse the trial court's denial of his motion for mistrial. *See State v. Austin*, 470 So.2d 406 (La.App. 3 Cir. 1985); *Hopkins*, 626 So.2d 820.

In his pro se brief, Defendant questions Ms. Pickney's credibility and reliability, arguing her in-chambers testimony in which she stated that she was looking at the door and not paying attention to the defense was "unrealistic." Because there was no one else in the courtroom at that time, according to Defendant, Ms. Pickney must have heard their conversation. He acknowledges that Ms. Pickney was questioned but says "her honesty was never verified." Therefore, Defendant argues the trial court should have granted his motion for mistrial or, "at the very least," the trial court should have replaced Ms. Pickney with an alternate juror.

We find that the trial court did not abuse its discretion in denying the motion for mistrial. The trial court conducted a thorough inquiry to determine the possibility of prejudice to Defendant and allowed both defense counsel and the State to question Ms. Pickney. Since Ms. Pickney denied hearing the defense's conversation, no prejudice could be shown or found. Furthermore, defense counsel did not ask for Ms. Pickney to be replaced with an alternate juror and did not move for an admonition; thus, Defendant cannot make this argument for the first time on appeal. La.Code Crim.P. art. 841. Accordingly, this assignment of error lacks merit.

**PRO SE ASSIGNMENT OF ERROR NO. 2:**

In his second pro se assignment of error, Defendant argues the trial court erred in denying his other motion for mistrial. During Defendant's direct examination, the State lodged an objection to a line of questioning by the defense, and the trial court held an in-chambers discussion on the evidentiary issue. The lengthy discussion involved defense counsel's repeated questions referencing hearsay statements made by Ms. Zuccarro. The State argued the defense could not reference hearsay statements allegedly made by the victim, because Defendant could not "kill

somebody, come into court and . . . say what the hell the person you killed did." The State also indicated that Defendant could lie about what Ms. Zuccarro said and "make up any kind of shit in the universe."

After the trial court ruled on the objection, defense counsel continued his direct examination of Defendant and then moved for a mistrial, explaining:

> **MR. BIROTTE**: Yes. Yes, Your Honor, out of an abundance of caution, I'm going to move for a Mistrial at this time um, due to the fact that the Court's deputy, bailiff came in while we were in the Court's Chambers, the bailiff was actually sitting out into the Court um, and he came in and asked us to keep it down because obviously he could hear what was being discussed in chambers um, and it was of such a nature that he felt the need to come in here and ask us to be quiet, to keep it down because the jurors could hear. The way the courtroom is positioned, the way Chambers are positioned in this courtroom, Your Honor, the jury box is closer to this office than is [sic] the Court's bailiff. So if the bailiff . . . heard it in such a matter that prompted him to come and ask us to be quiet, then I submit that the jurors heard it, as well and if they heard what we were talking about back here, Your Honor, it was some pretty inflammatory speech. Um; and I understand that it's a very volatile situation we're dealing with a murder here[;] there was some profanity used by representative for the State and it was thrown out quite a few times that my client killed her, he killed her, he doesn't get to -- it was very volatile and I believe that it was in the ear shot of the jury. If it was certainly in the ear shot of the Court's bailiff who was sitting farther from the Court's Chambers than is [sic] the jury and it has a great likelihood that it is prejudice the jury against my client[;] out of an abundance of caution, I move for a Mistrial.

In response, the State argued there was no profanity used and further argued the accusation that Defendant killed Ms. Zuccarro formed the basis of the trial.

The trial court decided to question the bailiff, Deputy Cleveland Thomas, about the situation. Deputy Thomas swore under oath that, from where he was sitting in the courtroom, he could hear voices coming from the chambers, but he denied that he could hear any specific words. Deputy Thomas testified that he walked to the door leading to the chambers but still could not make out the words being said. He said he decided to tell the judge, the State, and defense counsel to "bring it down" as a precautionary measure and out of an abundance of caution. However, Deputy Thomas stated he had hearing issues and said the jurors might have better hearing

23

than him. The trial court denied the mistrial based on Deputy Thomas' testimony that he did not hear any words.

The inflammatory remarks made by the State do not fall under La.Code Crim.P. art. 770, which calls for a mandatory mistrial.[4] Rather, the motion for mistrial is covered by La.Code Crim.P. art. 771, which leaves the granting of a mistrial to the discretion of the trial court. Defendant has failed to make a showing that the discussion was heard by the jury or that there was any impropriety demonstrated in the discussion. *See State v. Brown*, 319 So.2d 409 (La.1975). Even if the jury heard the State's remarks that Defendant killed Ms. Zuccarro and could not now "make up any kind of shit," the jury could logically view the comments as that of a "partisan, perhaps combative, frustrated State's advocate[.]" *Id*. at 413. Thus, he has not established prejudice or an abuse of discretion by the trial court, and this assignment of error is without merit.

## SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR NO. 1:

In his first supplemental pro se assignment of error, Defendant argues the trial court abused its discretion in denying his pro se motion for new trial. Defendant's

---

[4]Louisiana Code of Criminal Procedure Article 770 provides the mandatory grounds for mistrial:

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> (1) Race, religion, color or national origin, if the remark or comment is not material and relevant and might create prejudice against the defendant in the mind of the jury;
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;
>
> (3) The failure of the defendant to testify in his own defense; or
>
> (4) The refusal of the judge to direct a verdict.
>
> An admonition to the jury to disregard the remark or comment shall not be sufficient to prevent a mistrial. If the defendant, however, requests that only an admonition be given, the court shall admonish the jury to disregard the remark or comment but shall not declare a mistrial.

24

motion was based on the allegation that there was newly discovered evidence—photographs of Ms. Zuccarro's wrecked truck—which would have changed his guilty verdict.[5] The trial court convened for a contradictory hearing on April 6, 2023, but continued the hearing until June 13, 2023, at which time the motion was denied:

> The Court finds that the defendant had open file discovery to where it could [have] determined, or obtained all of that information prior to trial, but it did not, so the Court finds that the allegations of new and material evidence is ungrounded and the Motion for New Trial is denied.
>
> . . . .
>
> **THE COURT**: The Court finds -- the Court finds that the new evidence could have been discovered.

The standard of reviewing a trial court's ruling on a motion for new trial is as follows:

> The denial of a motion for a new trial is not subject to appellate or supervisory review except for error of law. La.Code Crim.P. art. 858. The decision on a motion for new trial rests within the sound discretion of the trial judge. We will not disturb this ruling on appeal absent a clear showing of abuse. The merits of such a motion must be viewed with extreme caution in the interest of preserving the finality of judgments. Generally, a motion for new trial will be denied unless injustice has been done. *See* La.Code Crim.P. art. 851; *State v. Home [Horne ],* 28,327 (La.App.2d Cir. 8/21/96), 679 So.2d 953, 956, *writ denied,* 96–2345 (La.2/21/97), 688 So.2d 521.
>
> *State v. Austin*, 11–2150, p. 7 (La.App. 1 Cir. 6/8/12), 2012 WL 2061531 (unpublished opinion), *writ denied,* 12–1595 (La.2/8/13), 108 So.3d 77.

*State v. Pontiff*, 14-1049, pp. 16–17 (La.App. 3 Cir. 5/6/15), 166 So.3d 1120, 1132, *writ denied*, 15-1107 (La. 10/28/16), 209 So.3d 94 (alteration in original).

---

[5]Defendant filed his motion for new trial after the imposition of his sentence. He was sentenced on November 2, 2022, but his motion for new trial was not filed until February 23, 2023. A motion for new trial must be filed and ruled on before the imposition of sentence. La.Code Crim.P. art. 853(A). However, when a motion for new trial is based on newly discovered evidence as set forth in La.Code Crim.P. art. 851(B)(3), the motion must be filed within one year after verdict, even if a sentence has been imposed. La.Code Crim.P. art. 853(B). Thus, Defendant's motion for new trial was timely filed.

Louisiana Code of Criminal Procedure Article 851 provides six grounds for a new trial. The third ground is based on "[n]ew and material evidence that, notwithstanding the exercise of reasonable diligence by the defendant, was not discovered before or during the trial, is available, and if the evidence had been introduced at the trial it would probably have changed the verdict or judgment of guilty." La.Code Crim.P. art. 851(B)(3).

> A motion for a new trial based on ground (3) of Article 851 shall contain allegations of fact, sworn to by the defendant or his counsel, showing:
>
> (1) That notwithstanding the exercise of reasonable diligence by the defendant, the new evidence was not discovered before or during the trial;
>
> (2) The names of the witnesses who will testify and a concise statement of the newly discovered evidence;
>
> (3) The facts which the witnesses or evidence will establish; and
>
> (4) That the witnesses or evidence are not beyond the process of the court, or are otherwise available.
>
> The newly discovered whereabouts or residence of a witness do not constitute newly discovered evidence.

La.Code Crim.P. art. 854.

Additionally, there are four jurisprudential requirements which must be proven for a motion for new trial based on newly discovered evidence to be granted: (1) the evidence must have been discovered since the trial; (2) failure to learn of the evidence at the time of trial must not be due to defendant's lack of diligence; (3) it must be material to the issues at the trial; and (4) it must be of such a nature that it would probably produce an acquittal in the event of a retrial. *State v. Hidalgo*, 20-89 (La.App. 5 Cir. 3/18/20), 293 So.3d 780 (citing *State v. Richoux*, 11-1112 (La.App. 5 Cir. 9/11/12), 101 So.3d 483, *writ denied*, 12-2215 (La. 4/1/13), 110 So.3d 139).

> Under La.C.Cr.P. 851, newly discovered evidence must first be determined to be "material." Evidence is material only if it is reasonably probable that the result of the proceeding would have been different had the evidence been disclosed. *State v. Marshall*, 94-0461, p. 16 (La. 9/5/95), 660 So.2d 819, 826 (*citing United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)). "A reasonable probability is one that is sufficient to undermine confidence in the outcome" of the trial. *Marshall*, 94-0461, p. 16, 660 So.2d at 826. A district court should ascertain on a motion for new trial "whether there is new material fit for a new jury's judgment. The only issue is whether the result will probably be different." *State v. Watts*, 00-0602, p. 9 (La. 1/14/03), 835 So.2d 441, 449. The decision of whether to grant or deny a motion for new trial is within the trial judge's sound discretion. *State v. Brisban*, 00-3437 (La. 2/26/02), 809 So.2d 923.

*State v. Holliday*, 17-1921, pp. 78–79 (La. 1/29/20), 340 So.3d 648, 709, *cert. denied*, ___U.S. ____, 141 S.Ct. 1271 (2021).

We find that Defendant has not met the statutory and jurisprudential requirements necessary to support a successful motion for a new trial. First, Defendant's motion posits that the photographs depicting the car wreck constitute newly discovered evidence. The photographs are not newly discovered evidence as the photographs were taken as part of the crash report conducted by the Louisiana State Police. The "State of Louisiana Uniform Motor Vehicle Crash Report" was turned over to Defendant during discovery. Thus, the photographs were either discovered or discoverable prior to trial. Moreover, this evidence is not material, in that there is no likelihood the result of trial would be different with the addition of the photographs. Numerous witnesses testified at trial that a wreck occurred before Ms. Zuccarro's death, and the witnesses described the nature of the wreck. The photographs do not prove that Ms. Zuccarro died as a result of the car wreck. Finally, Defendant admitted at trial that he hit Ms. Zuccarro several times in the abdomen, and he testified that she died shortly thereafter. Considering the above, the trial court did not abuse its discretion by denying Defendant's motion for new trial based on newly discovered evidence. Thus, the assignment of error lacks merit.

27

**SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR NO. 2:**

In his second supplemental pro se assignment of error, Defendant asserts the trial court erred in allowing a deputy to speak during his motion for new trial hearing held on April 6, 2023.[6] Defendant does not reference any objection he made regarding the deputy's statements or any ruling by the trial court nor does he explain how the deputy's statements were impermissible. He also fails to address any applicable law and relevant jurisprudence in the discussion of this issue. Defendant's brief does not comply with Uniform Rules—Courts of Appeal, Rule 2–12.4. Therefore, this court will not consider this issue. *See State v. Blade*, 20-172, 20-173 (La.App. 3 Cir. 4/28/21) (unpublished opinion), *writ denied*, 21-754 (La. 10/1/21), 324 So.3d 1059; *see also State v. Rogers*, 21-101 (La.App. 3 Cir. 6/1/22) (unpublished opinion), *writ denied*, 22-1548 (La. 12/20/22), 352 So.3d 84, *and writ denied*, 22-1485 (La. 12/20/22), 352 So.3d 85, *and writ denied*, 22-1551 (La. 12/20/22), 352 So.3d 86.

**SUPPLEMENTAL PRO SE ASSIGNMENT OF ERROR NO. 3:**

Finally, Defendant contends it was error for the trial court to allow him to appear at his June 13, 2023 motion for new trial hearing via videoconference. As a result, Defendant argues the "paperwork" that supported and proved his claims were not considered by the trial court before denying his motion for new trial. On March 24, 2023, Defendant filed a "Petition and Order for Writ of Habeas Corpus Ad Prosequendum", which requested that he be transported to the trial court for his motion for new trial hearing to be held on April 6, 2023. Such order was granted by the trial court, and Defendant appeared in person for the April 6, 2023 hearing. At the April 6, 2023 hearing, the trial court decided to reset the hearing and told

---

[6]During the hearing, Defendant indicated to the trial court that he had problems bringing his legal documents through jail security to court and had problems issuing subpoenas duces tecum. A deputy who was present in the courtroom told Defendant how to remedy his problems, and Defendant and the deputy engaged in a conversation.

Defendant he had to file another writ in order for him to be transported for the June 13, 2023 hearing:

> **THE COURT**: Let's go ahead and set it for June 13th at nine o'clock?
>
> **MS. QUIRK** (DEPUTY WITH MR. MCPHEARSON)[:] Y'all can get me a Writ for that date?
>
> **THE COURT**: McPhearson, you will prepare your Writ to get you here for the hearing on June 13th.
>
> **MR. MCPHEARSON**: Okay[.]

Defendant did not file a writ of habeas corpus to ensure his presence at the June 13, 2023 hearing. Though he argues to this court that he had "paperwork" to support his arguments, Defendant did not specify what the documents were or what the documents entailed. Furthermore, because Defendant's motion for new trial was without merit, the trial court did not abuse its discretion in allowing Defendant to appear via videoconference.

Accordingly, Defendant's conviction and sentence should be affirmed.

**DECREE:**

For the foregoing reasons, Defendant's conviction and sentence are affirmed.

**AFFIRMED.**

This opinion is NOT DESIGNATED FOR PUBLICATION.
Uniform Rules—Courts of Appeal, Rule 2–16.3.